# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 20-10V
### UNPUBLISHED

| | |
|---|---|
| JASON BERBERICH,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: September 14, 2021<br><br>Special Processing Unit (SPU); Entitlement; Influenza (Flu); Shoulder Injury Related to Vaccine Administration (SIRVA); Prior Bursitis; Damages; Pain and Suffering. |

*Leah VaSahnja Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*Zoe Wade*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION ON DAMAGES[1]

On January 3, 2020, Jason Berberich filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a shoulder injury related to vaccine administration ("SIRVA") causally related to the influenza ("flu") vaccine received on November 20, 2018. *See* Petition at Preamble; ¶¶ 3, 12. The case was assigned to the

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Special Processing Unit ("SPU") of the Office of Special Masters. The parties have disputed both entitlement as well as the proper damages to be awarded.

For the reasons set forth below, I find that Petitioner is entitled to compensation, and that a reasonable sum to be awarded is **$61,135.41 (representing 60,000.00 for past pain and suffering, and $1,135.41 for past unreimbursed expenses).**

**I.     Relevant Procedural History**

The claim completed the pre-assignment review ("PAR") process and was assigned to the SPU in February 2020 (meaning that its one-year anniversary would arrive in the winter of 2021). During the initial status conference, it was noted that the record documented relatively little medical treatment during the three years prior to vaccination. ECF No. 14 at 1. Petitioner's counsel confirmed that there were no outstanding records from this period. *Id.*

On June 22, 2020, Respondent advised that his counsel's preliminary review had not identified any legal or factual issues requiring additional support, or any complicated medical issues that would render the case inappropriate for SPU. ECF No. 15. However, Respondent suggested – citing my general rule that cases should make substantial progress within one year of PAR activation, as well as Respondent's estimate, due to his existing backlog, that he would not complete a formal review of this case for another eighteen (18) months, by December 30, 2021 – that this case might not be appropriate for SPU. *Id.* at 2.

Petitioner objected that Respondent's delayed review violated the letter and the spirit of the Vaccine Program and was particularly unreasonable given the paucity of relevant medical records (totaling only 90 pages). Petitioner moved to compel Respondent to review the case and file his Rule 4(c) Report within a shorter period of time, "but no later than December 2020." ECF No. 16 at 4.[3] Alternatively, he asked that

---

[3] Petitioner also cited Respondent's prior representation, to the Advisory Committee on Childhood Vaccines that the *average* time for a medical review was nearly 10 months. ECF No. 16 at 4, referring to The Advisory Committee on Childhood Vaccines, *The National Vaccine Injury Compensation (VICP) Division of Injury Compensation Programs (DICP) Program Update*, March 6, 2020, available at https://www.hrsa.gov/sites/default/files/hrsa/advisory-committees/vaccines/meetings/2020/03062020-dicp-update.pdf (last visited August 18, 2021) (subsequently filed herein by Respondent as Ex. A). Upon review, Respondent's representation seems to be a general average for *all* claims filed in the Vaccine Program (not limited to claims filed by adults, concerning SIRVA, or assigned to the SPU). Respondent also noted that following that ACCV meeting, a number of his medical reviewers had been deployed to respond to the COVID-19 pandemic. ECF No. 17 at 2; *see also* Proclamation 9994, 85 F.R. § 15337 (March 13, 2020) (declaring COVID-19 a national emergency).

2

Respondent be ordered to show cause why Petitioner should not be granted compensation "within 15 days" thereafter. *Id.* In reaction, Respondent argued that Petitioner's requested relief in this particular case would represent an "unequitable" and "short-sighted solution" to the "more systemic problem" of Respondent having insufficient resources to timely review the current number of claims in the Vaccine Programs, primarily alleging SIRVAs. ECF No. 17 at 6-7.[4]

During a status conference on September 1, 2020, I denied Petitioner's Motion without prejudice, but noted my expectation that the parties would engage in active litigative risk settlement discussions through February 25, 2021, especially in light of Respondent's failure to identify any substantive issues in the case. I also indicated that I would likely invite Petitioner to file a motion for a ruling on the record prior to February 25, 2021, If the parties did not demonstrate adequate progress in their discussions. Scheduling Order (ECF No. 20); *see also* Transcript (ECF No. 22).

Petitioner conveyed a demand and supporting evidence on September 30, 2020. ECF No. 23. On November 13, 2020, Respondent estimated that he would determine his position in this case by June 25, 2021, and that he would not engage in any discussions of settlement in the interim. ECF No. 24. Subsequently and with my authorization (*see* ECF Nos. 25-26), on February 25, 2021, Petitioner filed a combined brief in support of entitlement and damages, specifically requesting $80,000 for past pain and suffering and $1,135.41 for past unreimbursed expenses. Motion (ECF No. 27).

On March 30, 2021, Respondent completed his medical review and conveyed a settlement offer to Petitioner. ECF No. 29. The next day, Petitioner advised that the parties were too far apart in their respective valuations of the case. ECF No. 30. Therefore, on April 30, 2021, Respondent duly filed his combined formal Rule 4(c) Report and responsive brief, opposing entitlement solely on the grounds that Petitioner was previously diagnosed with bursitis in the shoulder at issue (and therefore could not meet the Table SIRVA requirement that no prior cause for injury exist). Rule 4(c) Report and Response (ECF No. 31) at 7-8. And in the event that I found entitlement, Respondent asserted, the record did not support Petitioner's pain and suffering request of $80,000.00 – although he did not propose an alternative figure, and deferred the calculation of unreimbursed expenses to my determination. *Id.* at 9-11. On May 23, 2021, Petitioner filed his Reply (ECF No. 32). The matter is now ripe for adjudication.

---

[4] In a reply, Petitioner added a further request for relief: that Respondent should be required to "provide a comprehensive written explanation" as to why he, unlike the Department of Justice and the Court, had not updated his operating budget given that all three entities are funded through the same Vaccine Injury Trust Fund. ECF No. 18 at 3.

## II.  Relevant Factual Evidence

I have fully reviewed the evidence, including all medical records and affidavits, Respondent's Rule 4(c) report, and the parties' briefing. I find most relevant the following:

- During the three years prior to the subject vaccine, Petitioner did not have an established primary care provider or seek other medical attention on a regular basis.

- Over two years beforehand, on September 9, 2016, Petitioner presented for the first time to internist Dr. Paul Chan for a two-day history of worsening pain and limited range of motion of his left shoulder associated with remodeling his home. Ex. 3 at 17.[5] Dr. Chan observed "decreased range of motion, tenderness, and pain" presumably at the left shoulder, but did not record any further details. *Id.* at 18. Dr. Chan assessed bursitis, prescribed a 10-day supply of a topical non-steroidal anti-inflammatory ("NSAID"), and instructed Petitioner to return if his symptoms either failed to improve or worsened. *Id.* at 16-20.

- Over a year later, on September 28, 2017, Petitioner returned to Dr. Chan's practice solely to receive a flu vaccine, which was recorded as being administered in his right deltoid. Ex. 3 at 10-15. This record does not include any complaints or a physical examination. *Id.* There are no further records from Dr. Chan's practice.

- On November 8, 2018, Petitioner received the subject flu vaccine in his left deltoid, at his workplace. Ex. 1 at 1.

- Twelve (12) days later, on November 20, 2018, Petitioner presented for the first time to internist Dr. Enrique Tobias. Ex. 2 at 7-15. Petitioner reported no prior medical history except for a two-week history of left shoulder pain following a flu vaccine. *Id.* at 8. He had tried Advil with no relief and his current pain level was 2/10. *Id.* at 8, 11. Dr. Tobias observed decreased range of motion as well as tenderness in the left shoulder. *Id.* at 8. Dr. Tobias's assessment was "chronic left shoulder pain." *Id.* at 7. He administered a steroid injection to the left shoulder bursa, prescribed an oral NSAID, and instructed Petitioner to return if the symptoms did not improve. *Id.*

---

[5] Petitioner stated that he had "a little" pain upon waking up on Wednesday, which was September 7, 2016, and he awoke with more severe pain rated at 7/10 on Thursday, which would be September 8, 2016. Ex. 3 at 17; *see also Calendar for Year 2016*, available at https://www.timeanddate.com/calendar/?year=2016&country=1.

- Petitioner did not return to Dr. Tobias for any further appointments, but sent several emails updating the status of his shoulder condition. On December 12, 2018, Petitioner reported that the pain was not as acute as it was initially, but it still persisted enough to limit his range of motion. He was unable to perform a previous exercise routine and the pain and discomfort made sleeping difficult. Ex. 2 at 16.

- Dr. Tobias then ordered a January 3, 2019, MRI of Petitioner's left shoulder. Ex. 2 at 38. The radiologist perceived "a tiny focus of marrow edema in the superolateral margin of the greater tuberosity in the setting of subacromial/subdeltoid bursitis," which "can occasionally be seen as an inflammatory response following a deep vaccine administration." *Id.* There was also mild tendinosis in the supraspinatus tendon without tear. *Id.*

- On January 9, 2019, Petitioner emailed Dr. Tobias to ask what steps would be necessary if he wanted to pursue physical therapy ("PT"). Ex. 2 at 23. A week later, Petitioner responded that PT "may no longer be necessary" as his shoulder had "dramatically improved." *Id.*

- On April 8, 2019, Petitioner emailed that despite his hopes, his shoulder symptoms had plateaued in January and not improved further. He asked whether Dr. Tobias still recommended PT. Ex. 2 at 27.

- Dr. Tobias referred Petitioner to an April 16, 2019, consult with an orthopedist, Dr. Kevin Dahl. Ex. 2 at 31-33. Dr. Dahl recorded Petitioner's history of shoulder pain since a flu shot in November, which was worse with activity and at night. *Id.* at 31. Petitioner rated his current pain at 5/10. *Id.* at 33. Upon independent review of the MRI images, Dr. Dahl agreed that they depicted supraspinatus tendinosis without tearing and fluid in the subacromial/subdeltoid space. *Id.* at 31. On exam, Dr. Dahl found full active range of motion with some moderate discomfort overhead and a positive Hawkins impingement test. *Id.* His overall impression was left shoulder impingement syndrome. *Id.* He administered a second steroid injection to the left shoulder and bursa. *Id.* at 35. There are no further records from Dr. Dahl.

- On July 10, 2019, Petitioner had his first PT session. Ex. 5 at 1-3. He reported left shoulder pain starting after the flu vaccination which had "improved somewhat" and was currently "intermittent… with certain movements/use of the arm." *Id.* at 1. The physical examination found mild weakness, with full range of motion, but "pain elicited at end-range flexion and extension with painful arc" and positive impingement signs. *Id.* at 2. Petitioner was given a home exercise program and told to "recheck in PT in three weeks." *Id.* at 3.

5

- On August 15, 2019, Petitioner attended a second PT session. Ex. 5 at 1-5. His left shoulder pain had decreased 30% since the prior session, even without doing the home exercises "as consistently as instructed." *Id.* at 1. His pain level was 0/10 at rest and 3/10, intermittently, with activity. *Id.* at 4. The assessment was "mild painful weakness rotator cuff." *Id.* at 5. Petitioner would continue with home exercises and follow up in one month if he required further treatment, which he did not. *Id.* He was formally discharged from PT on September 25, 2019. *Id.*

- In his affidavit, Petitioner admits that he had "a brief incident of shoulder pain more than two years earlier," but that pain "lasted a few days and never returned." Ex. 6 at ¶ 10. He had been "pain-free" for years upon receiving the November 6, 2018, flu vaccination. *Id.* The post-vaccination pain was "completely different than anything [he] had ever felt before" and "the worst pain [he] ever experienced." *Id.*

- Petitioner recalls experiencing pain in his upper arm immediately upon vaccination and complaining about it to his wife that evening. Ex. 6 at ¶¶ 1-2. He recalls having difficulty sleeping, completing activities of daily living, and playing with his children. *Id.* at ¶ 3-5, 7. The shoulder pain and limited range of motion disrupted his job at Microsoft, which primarily involved typing for long periods of time, as well as the hour and fifteen-minute commute. *Id.* at ¶ 6. The injury also interfered with his exercise routine (involving weightlifting, rowing, yoga, and bodyweight exercises). *Id.* at ¶ 8.

## III. Entitlement

### A. Authority

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed.

Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[6] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XII)(A). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> *Shoulder injury related to vaccine administration (SIRVA).* SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g., tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

---

[6] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and that he has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

7

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B. Application

After a review of the entire record, I find that Mr. Berberich has established, by a preponderance of the evidence, all of the QAI requirements for a Table SIRVA.

Respondent's sole objection to entitlement is the evidence of Petitioner's history of problems in the affected shoulder which were experienced prior to vaccination, and which would arguably explain the symptoms he experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent correctly notes that Petitioner had a single scheduled appointment for acute left shoulder pain and limited range of motion, assessed as bursitis, before vaccination. Rule 4(c) Report at 7. But Petitioner persuasively notes that this encounter was a full *twenty-six (26) months earlier* and was associated with a particular mechanical stressor. In addition, after just one medical encounter, he did not seek any further treatment and he recalls being entirely pain-free until receiving the vaccine. Reply at 2-4.

It is also the case that on November 20, 2018, Dr. Tobias recorded that Petitioner had "chronic" shoulder pain. But at this time, he recorded Petitioner's history that pain had been present for approximately two weeks, beginning with the flu vaccine he had recently received. Dr. Tobias did not demonstrate any knowledge of the previous diagnosis of bursitis which was made at a different medical practice over two years prior. The "chronic" notation thus does not demonstrate that Petitioner had been experiencing continuous shoulder pain throughout that time, or a recurrence of the very same pain, as opposed to a new and distinct injury as he alleges.

Otherwise, there is no evidence in the record before me that bursitis would necessarily persist, or have an acute recurrence, more than two years later. Moreover, the MRI report supports the conclusion that the visualized bursitis could be explained by "an inflammatory response following a deep vaccine administration." Ex. 2 at 38. Given all of the above, a preponderance of the evidence before me does not support a linkage between Petitioner's prior history and his post-vaccination acute injury.

Petitioner has satisfied all requirements for a Table SIRVA. To be eligible for compensation, he must also provide preponderant evidence of the additional requirements of Section 11(c), i.e. receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* Section 11(c)(1)(A)(B)(D)(E). But Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements. I therefore find that Petitioner is entitled to compensation in this case.

## IV. Damages

### A. Authority

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting

9

*McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[7] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

I have periodically provided statistical data on pain and suffering for SIRVA claims resolved in SPU. *See, e.g., Berge v. Sec'y of Health & Human Servs.*, No. 19-1474V, 2021 WL 4144999, at *2-3 (Fed. Cl. Spec. Mstr. Aug. 17, 2021). As noted in *Berge*, as of July 1, 2021, in 69 SPU SIRVA cases that required reasoned damages determinations, compensation for past pain and suffering ranged from $40,000.00 to $210,000.00. *Id.* at *3. Delays in seeking medical treatment; mild to moderate pain, limitations in range of motion, and pathology; conservative treatment measures; shorter durations; and good recoveries have all pointed towards lower pain and suffering awards. *Id.*

---

[7] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of that injury to be considered. When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Petitioner requests $80,000.00 for his past pain and suffering, based on a characterization that his SIRVA "was at least moderately severe and that his course has been long." Pet. Reply at 7. Respondent counters that Petitioner should receive a lower award because his "subjective complains of pain and limitations in ROM were both mild and of limited duration," he received fairly conservative treatment, and the MRI findings were mild. Response at 8.

Upon review, Mr. Berberich's medical records reflect the onset of pain immediately upon vaccination, and that he pursued medical attention in a prompt manner, receiving one cortisone injection just twelve (12) days post-vaccination. Thereafter, he showed "significant improvement" followed by a plateau, until eight months into the course of treatment, when he received a second cortisone injection for pain rated, at worst, at 5/10 associated with movement (although he was observed to have full ROM). Respondent is correct that the MRI Petitioner received on January 3, 2019, showed only one area of "mild" tendinosis, but Respondent omits the additional finding of fluid consistent with an inflammatory response to a vaccination. Mr. Berberich subsequently underwent 2 PT sessions, then reported that his pain had decreased "30%" and 0/10 and 3/10 intermittently with activity upon discharge nine months post-vaccination. And notwithstanding his assertion that he has needed to follow a home exercise program, at the second and last PT session he admitted that his shoulder had improved without doing the home exercises particularly consistently. Overall, the record supports a mild injury of moderate duration.

In light of the above, I agree with Respondent that the record indicates that Petitioner suffered less than two prior individuals who were each awarded $80,000.00 for pain and suffering from SIRVAs. Response at 8 (citing *Kent v. Sec'y of Health & Human Servs.*, No. 17-73V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019); *Russano v. Sec'y of Health & Human Servs.*, No. 18-39V, 2020 WL 3639804 (Fed. Cl. Spec. Mstr. June 4, 2020). Ms. Russano attended far more PT sessions and had "compensatory injuries… a history of breast cancer which affected use of the non-injured arm and chondrodermatitis nodularis necessitating multiple cortisone injections to her

right ear." *Russano,* 2020 WL 3639804, at *4. Ms. Kent had "significant levels of pain, prominent tendinosis, and profoundly limited ROM for approximately six months after vaccination"; she declined cortisone injections due to a sincere fear of needles; and she could not tolerate muscle relaxers due to nausea. *Kent,* 2019 WL 5579493, at *12.

However, Respondent has offered no decisions supporting an alternative sum to be awarded. I have repeatedly noted that past reasoned opinions from within the Vaccine Program serve as the best guidance for future cases. In such a case where Respondent disputes Petitioner's proposed pain and suffering figure, it would be helpful if Respondent cited one or more past cases that he believes represent better analogues. By not doing so, Respondent fails to fully defend his preferred position on this damages component.

I find that Petitioner's case is most comparable to *Dagen*, in which a relatively young, healthy, gainfully employed parent experienced fairly significant initial pain and reduced range of motion, which she reported to a medical provider within two weeks; she received conservative treatment including NSAIDs, two cortisone injections, and limited PT; and her shoulder injury largely improved within seven months of vaccination. *Dagen v. Sec'y of Health & Human Servs.*, No. 18-442, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00). However, Ms. Dagen also completed a prednisone taper, started PT more promptly, and attended more PT sessions (at least twelve, compared to Mr. Berberich's two). Here, I find that an appropriate award for Mr. Berberich's pain and suffering is the lesser sum of $60,000.00.

### C. Appropriate Compensation for Unreimbursed Expenses

Petitioner requests $1,135.41 for past medical expenses. Motion at 7. In support, he filed his explanation of benefits reflecting the treatment, dates of service, and amounts not covered by his employer-backed health insurance policy. Ex. 8. Based on this sufficient documentation and the lack of objection from Respondent, Petitioner is awarded the full sum of $1,135.41 for past medical expenses.

### V. Conclusion

Based on the record as a whole and both parties' arguments, **I award Petitioner $61,135.41 in compensation (representing $60,000.00 for past pain and suffering and $1,135.41 for unreimbursed expenses).** This amount represents compensation

for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this decision.[8]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.